UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RIDGELAKE ENERGY, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2248** |
| **APACHE CORP.** | **SECTION: "G"(2)** |

### ORDER

Before the Court is Plaintiff Ridgelake Energy, Inc.'s ("Ridgelake") "Motion for Summary Judgment," wherein it contends that it is entitled to summary judgment dismissing Apache's counterclaim.[1] Having considered the motion, the memoranda in support and in opposition, the statements made during oral argument, the record, and the applicable law, the Court will deny the motion.

### I. Background

This lawsuit arises out of a contract dispute between co-owners of an oil well. At all times relevant to this lawsuit, Defendant Apache Corporation ("Apache") owned and operated the Ship Shoal Block 26 production platforms (the "Host Facility").[2] Ridgelake and Apache each owned a fifty percent interest in Ship Shoal Well #14 (the "Well"), the production from which flows through the Host Facility.[3]

In 1995, Ashlawn Energy, Inc. ("Ashlawn") and Forcenergy Gas Exploration, Inc. ("Forcenergy") entered into a "Letter Agreement," which provides that Ashlawn "shall pay to

---

[1] Rec. Doc. 13.

[2] Rec. Doc. 13-6 at ¶¶ 1–2.

[3] *Id.* at ¶ 4.

1

Forcenergy its pro-rata share of all operating expenses directly attributable to the well or wells in which it participates."[4] At some point, Ridgelake acquired Ashlawn, and Forest Oil Corporation ("Forest Oil") acquired Forcenergy.

On September 30, 2005, Ridgelake and Forest Oil entered into a Participation Agreement, which provides, in part, that Ridgelake "shall pay its pro-rata share of all Host Facility operating expenses, including, but not limited to LOE and routine maintenance costs, that are directly attributable to the SS 26 #14 Well and the SS 26 #14 Production."[5] Forest Oil was later purchased by Mariner Energy, Inc. ("Mariner"), which was then acquired by Apache. It is undisputed that the relationship between Ridgelake and Apache is governed, at least in part, by the Participation Agreement.

On September 30, 2014, Ridgelake filed the underlying complaint in this case, seeking reimbursement for payments that it made to Apache for expenses which, it claims, were not directly attributable to the Well.[6] Ridgelake additionally alleges that Apache owes it a refund of $16,960.56 for "estimated plug and abandonment expenses" related to the Well.[7] In total, Ridgelake seeks damages of $608,434.66 from Apache.[8]

On October 28, 2014, Apache filed a counterclaim against Ridgelake, seeking $531,299.00 in unpaid Joint Interest Billing ("JIBs") related to maintenance work that was performed on the

---

[4] Rec. Doc. 13-4 at p. 4.

[5] Rec. Doc. 13-3 at ¶ 3.4.

[6] *Id.* at ¶ 18.

[7] *Id.* at ¶ 23.

[8] *Id.*. at ¶ 25.

2

Host Facility.[9] According to the counterclaim, Ridgelake has wrongfully refused to pay its fifty percent share of costs related to platform coatings to the Host Facility and for the replacement of a boat landing on one of the Host Facility's production platforms.[10]

Ridgelake filed the pending Motion for Summary Judgment on April 28, 2015, wherein it seeks dismissal of Apache's counterclaim because, it contends, the expenses at issue were not "directly attributable" to the operation of the Well.[11] Apache filed a memorandum in opposition on May 18, 2015,[12] and Ridgelake filed a memorandum in reply on May 21, 2015.[13] The Court heard oral argument on the pending motion on May 27, 2015.

## II. Parties' Arguments

### A.   *Ridgelake's Arguments in Support of Summary Judgment*

Ridgelake contends that it is entitled to summary judgment on Apache's counterclaim because, under the terms of Letter Agreement and the Participation Agreement, Ridgelake is only required to pay its pro-rata share of expenses "directly attributable" to the well.[14] According to Ridgelake, the costs of painting the Host Facility and replacing an attached boat launch are not "directly attributable" to the Well, but are rather matters of "routine maintenance" of the Host Facility.[15]

---

[9] Rec. Doc. 5 at ¶¶ 10, 11.

[10] *Id.* at ¶ 7.

[11] Rec. Doc. 13.

[12] Rec. Doc. 19.

[13] Rec. Doc. 22.

[14] Rec. Doc. 13-2 at p. 4.

[15] *Id.*

Ridgelake argues that the phrase "directly attributable," as it appears in the Participation Agreement, is unambiguous, and that the Court need not consider extrinsic evidence in resolving this dispute.[16] However, if the Court finds that the phrase is ambiguous, Ridgelake states that it "has presented affidavits from both of the sides [sic] that negotiated the very language at issue and both agree that the painting and boat landing expenses at issue are not expenses 'directly attributable' to the [Well] and its production and, hence, not owed by Ridgelake."[17] Ridgelake submits the affidavits of Louis F. Gilbert ("Gilbert"), former shareholder of Ashlawn, and J. Russell Porter ("Porter"), the former Vice President of Financial Planning and Analysis of Forcenergy.[18] Both Gilbert and Porter state that they negotiated the 1995 Letter Agreement and intended the language "operating expenses directly attributable" to exclude "expenses or costs for general maintenance of the Host Facility, such as the painting of those facilities and/or the replacement thereto of a boat landing."[19] According to Ridgelake, Apache, as successor to the Participation Agreement, cannot offer any interpretation of that document that differs from the meaning intended and given by Gilbert and Porter, the original parties.[20] Since the original contracting parties did not intend for the Letter Agreement to include the expenses at issue in the counterclaim, Ridgelake contends, summary judgement on the counterclaim is appropriate.[21]

---

[16] *Id.* at p. 5.

[17] *Id.*

[18] Rec. Docs. 13-4; 13-5.

[19] Rec. Doc. 13-4 at p. 2; Rec. Doc. 13-5 at p. 2.

[20] *Id.* at pp. 5–6.

[21] *Id.* at p. 6.

4

### B.     *Apache's Arguments in Opposition to Summary Judgment*

In opposition, Apache contends that Ridgelake's reliance on the Letter Agreement is erroneous because the Participation Agreement is the controlling contract in this case.[22] According to Apache, the Letter Agreement refers only to well-related expenses, but the Participation Agreement clearly encompasses both "Host Facility operating expenses" *and* "[Well] production."[23]

Like Ridgelake, Apache contends that the language in the Participation Agreement is unambiguous and that parol evidence is inadmissible in this case.[24] Alternatively, Apache argues, if the Court finds that the Participation Agreement is ambiguous, the Court should deny the pending motion for summary judgment because "[s]ummary judgment is rarely appropriate where a question remains as to the meaning of or intent behind certain provisions of a contract."[25] To the extent that this Court considers the affidavits submitted by Ridgelake, Apache states that those affidavits pertain only to the Letter Agreement, not the Participation Agreement, and that the affidavits are therefore irrelevant to the interpretation of the Participation Agreement.[26] Apache also argues that neither affiant was involved in drafting the Participation Agreement and, moreover, Gilbert may be biased because he has a financial interest in Ridgelake.[27]

Apache also argues that Ridgelake approved and paid for virtually identical authorizations

---

[22] Rec. Doc. 19.

[23] *Id.*

[24] *Id.* at p. 6.

[25] *Id.* at p. 7 (citing *Lacrouts v. Succession of Longo*, 923 So.2d 717, 719 (La. App. 1 Cir. 9/23/05)).

[26] *Id.*

[27] *Id.* at pp. 7–8.

5

for expenditure ("AFEs") relating to the maintenance and repair of platform coatings in 2008.[28] Apache points to the deposition testimony of Ridgelake's Vice President of Petroleum Engineering, John V. Rubin, who allegedly approved an AFE for repair and painting of a heliport located on the "C" platform of the Host Facility.[29] According to Apache, Rubin characterized that AFE as one for routine operating expenses and conceded that maintenance of the platform was critical to keep the Well in production because without a working platform, there would be no production from the Well.[30] Apache contends, additionally, that the Bureau of Safety and Environmental Enforcement ("BSEE") advised it that the Host Facility was in need of maintenance and repairs, and issued a verbal warning to that effect.[31] Finally, Apache argues that Rubin visited the Host Facility in June 2011 while the maintenance work at issue was underway and may have made recommendations "for additional work, or alterations to the existing work."[32] According to Apache, this demonstrates that Ridgelake recognized its obligations under the Participation Agreement.[33]

## C.    *Ridgelake's Arguments in Further Support of Summary Judgment*

According to Ridgelake, the merits of Apache's counterclaim turns on the meaning of the phrase "directly attributable" as used in the Letter Agreement and the Participation Agreement.[34] Specifically, Ridgelake characterizes the issue in this case as whether the painting and boat launch

---

[28]  *Id.* at p. 8.

[29] *Id.*

[30] *Id.* at p. 9.

[31] *Id.* at p. 11.

[32] *Id.* at p. 10.

[33] *Id.* at p. 11.

[34] Rec. Doc. 22 at p. 1.

6

repair expenses for which Apache seeks contribution from Ridgelake were "directly attributable" to the Well and its production.[35] Ridgelake argues that Apache was not a party to the transaction leading to either Agreement.[36] Rather, according to Ridgelake, Apache inherited those Agreements through the acquisition of Mariner, and thus is bound by the intent of the parties to those agreements.[37]

Ridgelake additionally contends that the Participation Agreement did not replace the Letter Agreement, but rather provides that the Letter Agreement "is ratified by the parties and incorporated into the Participation Agreement."[38] According to Ridgelake, the Participation Agreement explicitly provides that "[n]otwithstanding anything to the contrary, nothing in this Participation Agreement shall be considered as reducing or amending, nor does it reduce or amend, any rights Ridgelake currently enjoys under the 1995 [Letter] Agreement."[39]

Regarding the differences in wording between the Participation Agreement and the Letter Agreement, Ridgelake argues that the relevant phrase "directly attributable" is used in both agreements as a modifier to the term "operating expense," and that the purpose and meaning of "directly attributable" is the same in both agreements.[40] Next, Ridgelake contends that Apache seeks to "import meaning" from the fact that the Participation Agreement refers to "Host Facility operating expenses" while the Letter Agreement refers to "operating expenses," and the Participation

---

[35] *Id.*

[36] *Id.*

[37] *Id.* at p. 2.

[38] *Id.* at p. 3.

[39] *Id.*

[40] *Id.*

Agreement specifically references Well production, whereas the Letter Agreement does not.[41] It is Ridgelake's position that the use of the phrase "directly attributable" as a limitation on the operating expenses for which Ridgelake was responsible remained consistent in both agreements, and that this was the parties' intent.[42] Ridgelake additionally argues that the term "Host Facility" was included in both agreements.[43]

With respect to Apache's argument that Ridgelake's prior conduct demonstrates that it is liable for the expenses at issue, Ridgelake argues that Rubin signed only one AFE for similar expenses in 2008, and that he felt that "it certainly was not a good time to quibble over a small expense."[44] According to Ridgelake, Rubin received other AFEs for similar work after 2008, but "he did not sign those AFEs and, as a result realized that he had mistakenly signed the 2008 AFE."[45] Finally Ridgelake submits that it is irrelevant whether Rubin or Apache believed the work was necessary, or whether it was required by BSEE, because Ridgelake was only contractually obligated to pay for expenses "directly attributable" to the Well and its production, which does not include the expenses at issue.

### III. Law and Analysis

*A.* *Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[41] *Id.* at pp. 3–4.

[42] *Id.* at p. 4.

[43] *Id.*

[44] *Id.* at p. 5.

[45] *Id.* at p. 6.

8

a matter of law."[46] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[47] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[48] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[49] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[50]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[51] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[52] To withstand a motion for summary judgment, a plaintiff must show that there is a genuine issue for trial by presenting evidence of specific facts.[53] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to

---

[46] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[47] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[48] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[49] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[50] *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[51] *Celotex*, 477 U.S. at 323.

[52] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 513 U.S. 871 (1994).

[53] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012), citing *Anderson*, 477 U.S. 242 at 248-49.

the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[54] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[55]

*B.      Analysis*

Under the Louisiana Civil Code, "[i]nterpretation of a contract is the determination of the common intent of the parties."[56] "The language of the policy is the starting point for determining that common intent."[57] "The words of a contract must be given their generally prevailing meaning."[58] "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract."[59] "The determination of whether a contract is clear or ambiguous is a question of law. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate."[60] When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.[61] "[O]nly when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude

---

[54] *Little*, 37 F.3d at 1075.

[55] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[56] La. Civ. Code Ann. art. 2045.

[57] *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009).

[58] La. Civ. Code Ann. art. 2047.

[59] La. Civ. Code Ann. art. 2048.

[60] *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 590 (La. 2007) (internal citations omitted).

[61] La. Civ. Code Ann. art. 2046.

summary judgment."[62] "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."[63]

At issue in the pending motion is whether the expenses related to the painting of the Host Facility and replacing a boat launch attached thereto are "directly attributable" to the Well. The Participation Agreement provides that:

> [Ridgelake] shall pay its pro-rata share of *all Host Facility operating expenses*, including, but not limited to LOE and routine maintenance costs, *that are directly attributable to the SS 26 #14 Well* and the SS 26 #14 Production.[64]

The Participation Agreement also incorporates by reference the terms of the 1995 Letter Agreement,[65] which states that:

> . . . it is understood that . . . Ridgelake] shall pay to Forcenergy its pro-rata share of *all operating expenses directly attributable to the well* or wells in which it participates.[66]

Ridgelake's position is that the expenses at issue here were not "caused by" the Well, and that the original contracting parties did not intend the Letter Agreement to include expenses or costs for general maintenance of the Operator's facilities, such as the painting of those facilities and/or the replacement of a boat landing.[67] In response, Apache argues that consideration of extrinsic evidence of the parties' intent is inappropriate at the summary judgment stage, and that the parties' prior conduct creates a genuine issue of material fact with respect to whether they considered the

---

[62] *Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc.*, 180 F.3d 664, 669 (5th Cir. 1999).

[63] La. Civ. Code Ann. art. 2053.

[64] Rec. Doc. 13-3 at ¶ 3.4 (emphasis added).

[65] *Id.* at ¶ 2.2.

[66] Rec. Doc. 13-4 at p. 4 (emphasis added).

[67] Rec. Doc. 13-4 at p. 2; Rec Doc. 13-5 at p. 2.

11

expenses at issue to be "directly attributable" to the Well.

Summary judgment is a proper procedural method of determining the meaning of a contract when no factual issue is raised.[68] However, "[s]ummary judgment is rarely appropriate where a question remains as to the meaning of or intent behind certain provisions of a contract."[69] In this case, the provisions of both the Letter Agreement and the Participation Agreement are unclear and susceptible to multiple, inconsistent interpretations with respect to which types of "operating expenses" are considered "directly attributable to the well or wells."[70] Ridgelake proffers nearly identical affidavits purporting to establish the intent of the contracting parties, but the consideration of extrinsic evidence to determine the parties' intent raises a question of material fact which precludes summary judgement.[71] The Court finds, accordingly, that there is a material fact issue as to the true intent of the parties, and as to whether the contract requires Ridgelake to pay for its pro-rata share of the expenses at issue here.

Summary judgment is not appropriate for the additional reason that Apache has proffered sufficient evidence of the parties' prior conduct to raise a genuine issue of material fact as to whether the expenses at issue here were "directly attributable" to the well at issue. Accordingly, the Court

---

[68] *Lacrouts v. Succession of Longo*, 923 So.2d 717, 719 (La. App. 1 Cir. 9/23/05, 4) (citing *Latter & Blum, Inc. v. von Ruekfrang*, 249 So.2d 229, 233 (La. App. 4 Cir. 1971)).

[69] *Id*. (citing *Eiche v. East Baton Rouge Parish School Bd.*, 623 So.2d 167, 170 (La. App. 1 Cir. 1993)).

[70] *See Angus Chem. Co. v. Glendora Plantation, Inc*., 782 F.3d 175, 182 (5th Cir. 2015) (" It is too much of a stretch to say that the Agreement is clear and unambiguous in its language when there are multiple reasonable interpretations of the *implications* of the word 'replace.'").

[71] *See Carpenters Amended & Restated Health Ben. Fund v. Holleman Const. Co. Inc.*, 751 F.2d 763, 766 (5th Cir. 1985) ("To resolve these ambiguities, a court can no longer rely solely on the language of the contract to determine the parties' intent, and must look to extrinsic or parol evidence. Consequently, in these cases, questions of contract interpretation are questions of fact . . .").

finds that genuine issues of material fact are in dispute, and Ridgelake's motion for summary judgment must be denied.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Ridgelake's "Motion for Summary Judgment"[72] is **DENIED.**

**NEW ORLEANS, LOUISIANA,** this 18th day of June, 2015.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[72] Rec. Doc. 13.